Oteri vs. Oteri.

No. 9526.

JOSEPH OTERI VS. SALVADOR OTERI.

Held, that plaintiff was and remained one-fourth owner of ship "S. J. Oteri" until November 14, 1883, at which date his interest terminated by his voluntary acceptance of the return of the price which he had paid for said interest.

Held, that for the trips made by said ship prior to August 24, 1883, when the firm of S. Oteri & Bro., was dissolved and terminated, he is entitled to accounting of profits on same basis as had been always customary in previous transactions.

Held, that after the termination of the partnership, plaintiff's interest in the mercantile ventures of buying and selling fruit thereafter carried on by S. Oteri ceased; and that, as he could not be held for losses on such ventures, he cannot claim the profit. His interest thereafter was confined to his share of the earnings of the vessel *per se*. As these have not been kept in such manner as to enable us to ascertain their actual value, and as this is the fault of defendant, plaintiff is allowed his share of a liberal charter-price of the ship during that period.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

*J. P. Hornor* and *F. W. Baker* for Plaintiff and Appellee.

*W. S. Benedict* and *J. W. Gurley, Jr.*, for Defendant and Appellant.

The opinion of the Court was delivered by

FENNER, J. Prior to August 24, 1883, Salvador and Joseph Oteri were equal commercial partners under the style of S. Oteri & Bro., engaged in the fruit importing and commission business.

That partnership terminated on the 24th of August, 1883, as has been judicially determined by this Court. Oteri vs. Oteri, 37 Ann. 74.

In connection with their business they used a certain steamship named "S. J. Oteri."

The vessel was purchased while in course of construction in England, was completed for account of the purchaser and brought to this port. The purchase price, together with all expenses connected therewith and with her voyage hither, was paid with funds of the firm of Oteri & Bro., and was charged, on its books, one-half to Salvador, one-quarter to Joseph Oteri, and one-quarter to Salvador Pizzatti, a brother-in-law of Salvador Oteri; but the vessel was registered in the name of Salvador Pizzatti, as sole owner.

After some profitless trips to Aspinwall and Jamaica, the vessel was transferred to the trade between this port and Spanish Honduras and the Bay Islands, and so continued to run up to the time of this suit. The business of the ship was not embraced in the partnership of Oteri & Bro., but stood on a different basis.

The vessel was not used exclusively or mainly as a common carrier, though taking such freight outward as offered and carrying passengers

both ways. But the main business was the purchase of cargoes of fruit in the Honduranean ports, bringing them to New Orleans and re-selling them here either on the spot or by railroad shipments to interior markets.

The firm advanced all the expenses of the ship; furnished the funds for the purchase of the cargoes; and attended to all the business of receiving and re-selling them, for all of which it received a commission of five *per cent*, which commission was shared equally between the partners, Salvador and Joseph Oteri.

After the net profits on each trip had been ascertained, including the profits on the purchase and sale of cargoes as well as the earnings of the ship proper, this net profit was passed to the credit of the parties on the books of the firm, in the proportion of one-half to Salvador Oteri, and one-quarter each to Joseph Oteri and S. Pizzatti.

Pizzatti, acted as master of the vessel, receiving a salary therefor, and also furnished his services in the purchasing of the cargo, for which his long experience in the trade gave him great advantages.

After the dissolution of the firm, Joseph Oteri ceased to have anything to do with the business. S. Oteri made all the advances for the purchase of cargoes and attended exclusively to their reception, handling and re-sale.

It appears that, while Salvador Oteri and Pizzati were bosom friends Joseph Oteri was not on good terms with Pizzatti, and was not content with the arrangement under which the title to the whole vessel was left in the latter's name, and he insisted on having something to represent his interest in the vessel and to secure him against any wrongful use or disposition of the vessel by Pizzatti.

The method resorted to was the execution of a note by Pizzatti for the sum of $34,250, the exact amount of the purchase price paid by Joseph, which note was dated October 7, 1882, and matured in one year, without interest, and was secured by mortgage on the vessel.

When this note matured in October, 1883, Salvador Oteri, as agent of Pizzatti, tendered payment thereof, which Joseph declined to accept, denying that the note represented any debt due to him, and claiming that he held it merely as security against any injury to his interest as owner in the vessel which still continued. He afterwards demanded an accounting of the earnings of the vessel, which being refused and his interest therein disputed, he subsequently concluded, under advice of counsel, to accept the sum offered in payment of the note, under fear, as he alleges, that he might lose everything. Accord-

ingly, on November 14, 1883, he received $34,250 and surrendered the note.

The object of the present suit is to recover:

1st.   The sum of $25,000, which he alleges his interest in the ship worth in excess of the sum received by him as above set forth, and so received under restraint and fear occasioned by defendant's unjust conduct.

2d.   To recover his share of the profits and commissions on the various trips of the vessel made between June 13 and November 14, 1883.

### I.

The claim to an additional value for his interest may be summarily disposed of. The evidence satisfies us that such additional value did not exist; and even if it did, he would be precluded from claiming it by his voluntary act in accepting the sum stipulated in the note, which he well knew was paid to him in full satisfaction of his interest in or upon the ship, whatever it might be, whether as creditor for the price or part owner. He so received it and the binding effect of his act is not destroyed by any circumstance sufficient to establish legal error, violence or fraud.

### II.

We shall next dispose of several objections interposed by defendant in bar of plaintiff's right to claim an account of the earnings of the vessel.

1st.   Defendant denies that plaintiff was ever a part-owner of the vessel and claims that Pizzatti was the sole owner, and that both S. & J. Oteri were mere creditors for the portions of the price respectively contributed by them.

The registry of the vessel and the act of mortgage in favor of plaintiff, considered by themselves and without explanation, would support this view; but we agree with the district judge that the evidence in the case makes it perfectly clear that the Oteris and Pizzatti were the real owners of the vessel; that the title was placed in Pizzatti's name from considerations of convenience merely; and that the mortgage was intended solely to secure Joseph's interest against any wrongful disposition or incumbrance of the vessel by the apparent owner.

It would be tedious and unprofitable to recount all the multitudinous facts and circumstances leading to this conclusion; but we may mention among them the mode in which the business of the vessel was conducted, both before and after the execution of the mortgage; the testimony of Stella, the confidential clerk of S. Oteri, who continually

refers to the parties as joint owners; the testimony of Kelly showing that, when the vessel was brought out, he was consulted about having the title transferred to the names of the Oteris and Pizzatti, and then registering her in the name of Kelly as apparent owner; the petition filed in suit No. 7373, Civil District Court on December 26, 1882, (after the mortgage), wherein it is alleged that S. & J. Oteri and S. Pizzatti are "joint owners in certain proportions of the steamship S. J. Oteri"; and there are other facts equally conclusive. We, therefore, hold that Joseph Oteri was and remained a part owner of the vessel until the 14th of November, 1883, when he accepted payment for his interest.

2d. The pretended charter-party of August 13, 1883, whereby Pizzatti chartered the vessel to S. Oteri is too clumsy and transparent a sham and device to deserve further notice.

3d. Under our view above indicated of the nature and object of the act of mortgage, it is clear that the principles of admiralty law quoted by defendant have no application. Those principles are, that when one part-owner objects to some proposed employment of the vessel, he may require from his co-owners a stipulation equal to the value of his interest, for the safe return of the ship or for the payment of such value, and in such case the dissentient owner is not bound for expenses or entitled to share in the gains of the voyage. Abbott on Ship. p. 127.

But here, Joseph Oteri did not object to the employment of the vessel, but on the contrary sanctioned and participated therein, and the mortgage had reference to entirely different purposes already pointed out.

### III.

Let us now consider the rights of plaintiff under the accounting herein made of the earnings of the ship from June 13 to November 14, 1883.

There is no dispute about the liability of defendant for plaintiff's share in the profits of trip No. 18, which ended July 27, said share being $3,486.07. The only opposition of defendant to this allowance is a claim to offset against it a debt due by defendant for repairs of another vessel called the "E. B. Ward" owned by them jointly; but as this item is involved in a suit for settlement of accounts of that vessel, it need not figure in this case.

Trip No. 19 terminated on August 13, and stands on the same basis with the former. The only ground for claiming any difference between them is the contention of defendant that the partnership of S. Oteri & Bro., terminated on August 1; but as that contention has been judicially determined against him and the termination fixed of date August

24, we consider the plaintiff entitled to settlement of this trip on the same basis with prior ones, and to recover his share of the profits $1861.84, and his half of the commissions, $398.57, in all $2260.41.

Trip No. 20 began during the existence of the firm, but ended only two days after its termination, viz: on August 26. The venture is entitled to be considered as one of the firm, but the services in receiving and disposing of the cargo were rendered by S. Oteri alone. We think he will be sufficiently compensated for these extra services by allowing him the whole of the commissions and by awarding to plaintiff only his share of the profits, viz: $2005.17.

The remaining trips of the vessel stand upon a different footing.

After the termination of the partnership, defendant's mandate to bind the plaintiff by mercantile transactions in the purchase and sale of fruit terminated. From that date this part of the business was conducted with the means and labor of defendant and at his exclusive risk, and as plaintiff could not have been held liable for losses incurred on such account, he is equally barred from claiming an interest in the profits. It is no answer to say that defendant had in his hands ample means of plaintiff. The compensation for the retention of these means is interest. He had no right to embark them in commercial ventures and if he had done so and losses had resulted, could have claimed no exemption from liability on that account.

Plaintiff's interest was confined to his proportion, as part owner, of the earnings of the ship *per se*, including proper freights for the cargoes belonging to defendant. But the accounts of the vessel have been so kept that it is impossible to distinguish and ascertain the earnings of the vessel. We have, therefore, no alternative but to allow to plaintiff a reasonable compensation for the use of his share of the vessel. As it is defendant's fault that the accounts were so kept as to entail the necessity of this method of settlement, we think plaintiff is entitled to a liberal allowance. After duly weighing the evidence on that point, we conclude that $2500 a month would not have been an excessive charter-price for the steamer during this period, and we shall allow plaintiff his share of the sum for the period from August 26 until November 14, viz: two months and nineteen days, say one-fourth of $6583.27, or $1645.80.

It is, therefore, ordered, adjudged and decreed, that the judgment appealed from be amended by reducing the amount allowed from $14,975.54 to $9,397.45, with legal interest on $3,486.07 from July 27, 1883, and on $2,260.41 from August 13, 1883, and on $2,005.17 from August 26, 1883, and on $1,645.80 (by average date of earnings) from October 5, 1883; and that, as thus amended, the said judgment be in all other respects affirmed, plaintiff and appellee to pay costs of appeal.